J-A28004-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| K. L. W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| C. J. W. | : | No. 708 EDA 2016 |

Appeal from the Order Entered February 4, 2016
in the Court of Common Pleas of Chester County
Domestic Relations at No(s):  No. 2015-05718

BEFORE:  PANELLA, J., SHOGAN, J., and PLATT*, J.

JUDGMENT ORDER BY PANELLA, J.:        **FILED DECEMBER 23, 2016**

K.L.W. ("Mother") appeals from the February 4, 2016 order denying her request to relocate to West Dover, Vermont with her children, C.W., III, a male, born in February 1999; G.W., a female, born in September 2000; P.W., a female, born in February 2003; and T.W., a male, born in May 2005. We affirm.

The trial court set forth the factual and procedural history of this case, which we adopt herein. **See** Trial Court Opinion, filed 2/4/16, at 1-3.

Our scope and standard of review is as follows:

_____

* Retired Senior Judge assigned to the Superior Court.

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F., III v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

Upon careful review of the parties' briefs, the certified record, and the applicable law, we discern no abuse of discretion by the trial court. The thorough and comprehensive opinions of the Honorable David F. Bortner

dispose of Mother's issues on appeal. Accordingly, we affirm the order entered by the trial court based on Judge Bortner's opinions filed February 4, 2016, and April 20, 2016.[1]

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 12/23/2016*

---

[1] The parties are directed to attach a copy of these opinions in the event of further proceedings in this matter.

K‎██████ L. W█████                    : IN THE COURT OF COMMON PLEAS
            Plaintiff
                                      : CHESTER COUNTY, PENNSYLVANIA

            v.                        : CIVIL ACTION - LAW

                                      : IN CUSTODY

C█████ J. W█████,
            Defendant                 : NO. 2015-05718

Walter P. Eells, Esquire, Attorney for Plaintiff
Alexander J. Chotkowski, Esquire, Attorney for Defendant

## OPINION

In this custody matter, trial was conducted before the undersigned on the following dates: October 6 and 7, 2015; and January 5 and 8, 2016. The issue requiring disposition is raised in Plaintiff's, K██████ L. W████, (hereinafter "Mother") "Petition for Relocation" filed on July 13, 2015: whether Mother should be granted permission to relocate to West Dover, Vermont, with the parties' four children.

Mother filed a "Complaint for Custody" on July 1, 2015, and on that same date, sent to Defendant, C█████ J. W████ (hereinafter "Father"), the required Notice of Proposed Relocation. "Defendant's Answer to Plaintiff's Complaint for Custody and Counterclaim for Custody" was filed on July 22, 2015. "Defendant's Answer to Plaintiff's Petition for Relocation" was filed on August 3, 2015. Counsel for the parties have agreed on the record that, should Mother's relocation request be denied, the court would not immediately proceed to render a simultaneous decision on the competing claims for primary physical custody of the children, which rather will be

subsequently litigated, or amicably resolved, by the parties. Accordingly, the court will focus primarily on the relocation factors set forth in 23 Pa.C.S. §5337(h), and not perform a comprehensive analysis of the custody factors set forth in 23 Pa.C.S. §5328(a).

The court initially directed counsel to submit their closing arguments in writing by January 19, 2016, and granted an extension to January 20, 2016. Both sides timely submitted comprehensive and well-reasoned written closing arguments. For purposes of Pa.C.P. No. 1915.4(d), therefore, the trial was concluded on January 20, 2016. For the reasons set forth below, Mother's relocation request will be denied.

Mother and Father are the parents of four minor children: C████ W████, III, date of birth February ██, 1999 (soon to turn age 17); G███ W████, date of birth September██ 2000 (age 15); P███ W████, date of birth February ██, 2003 (soon to turn age 13); and T██████ W████ date of birth May ██ 2005 (age 10). The court heard testimony from the following witnesses: Mother; Kelsey Foley; Father; Tim Dougherty; R███ W████; S██████ W████ and K████ W████. On October 7, 2015, the court conducted individual in chambers interviews of each of the W████ children, beginning with T█████, followed by P███, then G███, and finally C█████. We offer in this Opinion a brief analysis of the evidence presented in explanation of the reasons for entering the attached Order. The Opinion does not purport to be a detailed discussion of the issues presented, which will be prepared if an appeal is taken.

2

We observe preliminarily that a somewhat unique circumstance exists in this case. Although Father filed a divorce complaint against Mother on May 7, 2015, thereby creating the legal separation of Father and Mother for purposes of determining a divorce, the parties and the four children have continued, with some strain, to reside under the same roof in "the farm" property located at ████████████ Road, Chadds Ford, Pennsylvania. This property is a rural tract of approximately 30 acres which is being rented from a family trust established by Father's parents, at a monthly rental amount of $3,500.00. Mother, Father and the four children have continuously resided at "the farm" since August, 2012. During the period preceding the filing of the custody complaint, Mother, Father and the four children resided, from 2007 to February 10, 2012, at ████████████ Madison, New Jersey, and then for a period of approximately 6 months, from February 10, 2012 to August 20, 2012, at ████████████, West Dover, Vermont. The West Dover property, jointly owned by parties since 2000, and principally used as a vacation destination (except for the 6 month period in 2012), is the residence to which Mother proposes to relocate with the children. There is no outstanding mortgage upon the Vermont property.

## RELOCATION FACTORS

Section 5337(h) of the Child Custody Act, 23 Pa.C.S. §5337(h), requires the court, in "determining whether to grant a proposed relocation," to "consider the following factors, giving weighted consideration to those factors which affect the safety of the child...." We note initially that the court is fully

3

satisfied that the children's safety will be assured both when in Mother's and Father's physical care and control. We shall consider the statutory relocation factors of Section 5337(h) in chronological order. The court recognizes that the factors refer to "the child" and that there are four children in this case. Where appropriate, the court will address a particular factor in terms of "the children." Where appropriate, the court will address each child individually.

**(h)(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the non-relocating party, siblings and other significant persons in the child's life:**

Both parties agree that it is desirable to keep all four children together, rather than split them among two locations. Accordingly, the "siblings" component of this factor need not be addressed. Mother has largely been a "stay-at-home" during the children's upbringing, while Father has primarily been the wage earner for the household. Other than relatively brief periods between employment positions, Father's income has been substantial (in the $400,000.00 gross annual income range). Father's daily work hours are long, and certain prior jobs have involved significant out-of-town travel. The court concludes that predominantly Mother has been the primary caretaker for the children, in terms of attending to their daily needs, with Father playing a lesser role. Therefore, with respect to "extent of involvement," Mother has been the parent more heavily involved. However, the court concludes, based on consideration of the evidence presented, that Father and Mother are equivalent in terms of the "nature," "quality," and "duration" of their relationships with the children.

**(h)(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child:**

The court finds that Mother's relocation to Vermont is likely to pose a significant impact for son, C███████ (hereinafter "C█████"), currently in his junior year at A█████████ A███████, and in his third year of attending A████████. Mother wishes to relocate immediately. We recognize that Mother's Petition for Relocation was filed on July 13, 2015, in advance of the commencement of the 2015-16 school year, but the reality is that the school year is now a bit more than half over. While Mother testified that the impact of the relocation upon C█████ "will be excellent," we question the advisability

4

of moving a 17 year old to a new school at this juncture. C████ has an I.E.P. for the special need of an unspecified learning disorder, and is afforded certain accommodations during testing. The testimony of Tim Dougherty, an English teacher and Director of Academics at A████, was that it would be disruptive for any student to leave a school after 2 years and, specifically, that it would be disruptive to C████ to transfer. We recognize that Mr. Dougherty, as a member of A████'s faculty, may have some inherent bias. However, even discounting his opinion by a degree for that reason, his testimony confirms the court's conclusion that Mother's proposed relocation is likely to cause a disruptive impact on C████'s educational development, and a potentially negative impact on his social and emotional development. Because G████, P████ and T████ are younger, we conclude the proposed relocation would produce the lower likelihood for an adverse impact upon their physical, educational and emotional development, subject to the concerns regarding "educational opportunity" addressed in factor (h)(7) below.

**(h)(3) The feasibility of preserving the relationship between the non-relocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties:**

The driving distance between "the farm" and West Dover, Vermont is approximately 321 miles one way, and, with necessary stops, the driving time is close to 7 hours, each way. (Father's Exhibit 5). This is not a scenario which will permit an alternating weekend partial custody schedule for Father. Mother's offer to allow Father to come to Vermont as often as he wants sounds accommodating, but is logistically unrealistic. As stated above, this family currently continues to reside together in the same residence. The relationship which Father and the children presently have is daily contact, unless he is occasionally traveling for business. Mother's initial argument is essentially that Father has always been a "weekend Dad," so that limiting or reducing his physical accessibility to the children would not represent much change, a position with which the court disagrees. We have considered Mother's other arguments addressing this factor – that she would move out of the Joans Ridge property to enable him to stay there on his weekend visits; that Father has a good salary such that he could rent or purchase a place of his own in Vermont to stay when visiting; that he could have "extended visits" over the holidays and summer – and find these not to be realistic substitutes for preserving his present relationship with the children. Accordingly, the court concludes that Mother has not demonstrated the feasibility of preserving Father's existing relationship with the children through suitable, alternative custody arrangements.

**(h)(4) The child's preference, taking into consideration the age and maturity of the child:**

T████, age 10, has a young appearance and seems to be of average maturity for his age. He mentioned a number of things he liked about Vermont and also things he liked about living in Pennsylvania. When asked directly in what ways he thought he would be better off as a kid living in Vermont, he answered: "I don't really know." 10/7/15 Transcript, p. 216, line 12. Thomas did not definitively express a preference about relocation one way or the other.

P███, age 12, has a favorable impression of ██MS (████████████ Middle School) which she would attend in Vermont. She believes she would have more "freedom" in Vermont, and likes the "year-round activities," such as sledding and building a fort. When directly questioned about a preference, she responded: "I think Vermont with – like, yeah, live in Vermont." 10/7/15 Transcript, p. 238, lines 21-22.

It is evident that G███, age 15, does not have a particularly good relationship with Father at present: "He's always been very short tempered with me." Id., p. 243, lines 16-17. She expressed a clear preference to move to Vermont, largely because she "do[es] know the academics are better." Id., p. 246, line 7. She has a keen insight into why she believes Mother wants to relocate: "I think she is uncomfortable with my – with living so close to my dad and his family.... He has been quite mean to her sometimes.... So I think she recognizes the fact that she would like to get away from him. I also think she wants to go somewhere she feels is home, too...." Interviewed at the time she had attended Archmere for one month, she did not like the school, giving it a "2" rating on a scale of 1 to 10. Her strong preference to move to Vermont, however, must be weighed together with the state of her present relationship with Father ("I think I would miss him occasionally, but I don't think I would be in tears about it.... So if anything, I don't think I would miss him." Id., p. 251, lines 14-16, 19-20), and her dislike for attending ████████.

C█████, soon to be 17, expressed neutrality. When asked to weigh the alternatives of staying in Pennsylvania or moving to Vermont, he stated: "I don't know. To be honest, I don't know. I would rather just have everyone stay together, but it's not my decision." Id., p. 267, lines 12-14. "I see the good in both and I see the bad in both." Id., p. 269, lines 17-18.

In sum, T█████ and C█████ expressed no preference; P███ and G███ both would prefer to relocate.

**(h)(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party:**

This factor is difficult to analyze because the parties are not yet living in separate residences. Both Mother and Father, while possessing different parenting styles (Father more the disciplinarian, Mother more laissez-faire),

6

are, each in their own way, very good parents to the children. The court finds that each parent generally promotes the relationships of the children with the other parent. The court finds there is no established pattern of conduct of either party to thwart the children's relationships with the other parent.

**(h)(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity:**

Mother fervently believes that relocation to Vermont will enhance the general quality of her life. We find that she genuinely feels that the West Dover property represents more of a "home" to her than "the farm" property. The court also finds that she views relocating to Vermont, and the geographic distance between Pennsylvania and Vermont, as a means of escaping physically and emotionally from having to deal with Father and his family. Mother has also convinced herself that the relocation will benefit the children academically and socially, inasmuch as she sees the Vermont schools as superior, and "the farm" as an isolated, non-neighborhood, location. The court concludes there would indeed be emotional benefit to Mother in relocating to Vermont.

However, at both the October and January hearing dates, Mother testified that she had potential offers of employment, but not a firm job offer. This relocation case is therefore distinguishable from one where there is a concrete job offer, or employment transfer, that is the prompting motive. Additionally, the employment prospects testified to are hourly, part-time positions. We recognize that her stay-at-home mom status, raising four children, has legitimately prevented her fulltime employment for many years, but she does have a Master's in Business Administration degree from Fairleigh Dickinson University. Further, she testified that she has not looked at all for any employment here in Pennsylvania or Delaware, where there would be wider opportunities than in rural Vermont. In terms of any possible financial benefit of relocation, it would not come from employment earnings. To the extent that the Joans Ridge residence is mortgage free, she would experience no monthly housing costs (except utilities and maintenance), but the property is a marital asset, the status of which may be impacted through equitable distribution in the pending divorce. Mother's assertion, that if the children attend tuition free schools in Vermont there would be a savings of existing private school tuition payments, is unpersuasive, because the children could relocate to a nearby "better" public school district here in Pennsylvania, such as Unionville-Chadds Ford or Tredyffrin-Easttown, and achieve the same savings.

Finally, Mother has not presented any evidence that the proposed relocation is for the purpose of her pursuing any educational opportunity.

7

**(h)(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity:**

As discussed above, this proposed relocation is not motivated by the lure of a lucrative job offer for Mother, and thus there will be no "financial benefit" to the children in terms of an increased household income, an improved standard of living, or an enhanced quality of life materially. It is unclear whether the children's relocation to West Dover will enhance the general quality of their lives by providing "emotional benefit." To the extent that there would be readily accessible skiing and other outdoor winter activities, there is an arguable enhancement. To the extent that the West Dover property is located in a residential neighborhood, there will necessarily be more children living nearby than at the 30 acre farm property, but some of the neighborhood families are seasonal vacation inhabitants, just as the Walters family presently is. The Joans Ridge residence has one "loft area" bedroom, and at least two of the children will need to share a single bedroom, whereas in "the farm" residence, each child has their own bedroom. Because Mother has no relatives living in Vermont, or the New England area, the relocation will reduce, not enhance, the ability of the children to have regular personal contact with their immediate relatives on both sides of the family, inasmuch as Father has many extended family members close by in Pennsylvania, and Mother's mother spends her summers in Ocean City, Maryland.

A major contention of Mother in this case is that the educational opportunities available to all of the children in Vermont are significantly superior to their present educational experiences. In particular, Mother urges a comparison of Burr and Burton Academy in Manchester, Vermont, and ▮▮▮▮▮ (We have already discussed under Factor (h)(2) above the inadvisability of Cl▮▮▮'s changing schools more than mid-way through his junior year). The court has reviewed the Burr and Burton Academy "Course of Study" booklet, contained as Tab 3 in Mother's Exhibit-1. The academic course offerings appear to be extensive, including many levels in a single subject and numerous advanced placement options. For example, in focusing upon the Mathematics Calculus classes, the following five courses are offered: "College Preparatory Pre-Calculus;" "Honors Pre-Calculus;" "Honors Calculus;" "Advanced Placement Calculus AB;" and "Advanced Placement Calculus BC." There also seems to be an emphasis on planning a student's curriculum over the span of four years.

The court concurs with Mother that Burr and Burton Academy appears to be an excellent school, but is unable to reach a conclusion as to whether, academically, Burr and Burton Academy is superior to ▮▮▮▮▮ In any event, the fundamental reason why Mother wishes to relocate to Vermont is not to provide superior educational opportunities for the children. That may,

8

or may not, be an indirect consequence of relocation, but it is not her motivation for relocation. Moreover, Burr and Burton Academy is an approximate one hour drive north of West Dover, in good weather conditions. No public transportation links the two towns, and C▓▓▓ would therefore be required to drive himself and G▓▓▓ a daily round trip of two hours. We believe this drive would eventually become tiresome. The logistics of the morning commute for both children are probably easily enough handled, but if C▓▓▓ and G▓▓▓ have different after-school activity involvement, which is likely, coordination of the daily afternoon return trip will pose a challenge.

In sum, largely because G▓▓▓ and P▓▓▓ have expressed a preference for the relocation, the court concludes that they would consider their general quality of life to be enhanced in Vermont. It is difficult to conclude one way or the other whether Thomas' general quality of life would be enhanced. It is easily concluded that, at his age, C▓▓▓'s general quality of life will not be enhanced.

## (h)(8) The reasons and motivation of each party for seeking or opposing the relocation:

As referenced in part throughout this Opinion, Mother has several reasons and motivation for seeking this relocation. First and foremost, Father has asked for a divorce and, given Father's "family trust" status of "the farm," and Mother's dislike for "the farm," she needs to relocate somewhere. She decided upon West Dover, Vermont because the parties jointly own the Joans Ridge residence, mortgage free, and because that property feels like "home" to her and, as she testified, it is "the one place that is consistent in the children's lives." Pursuant to the provisions of Section 5337(i)(2), Mother has met her burden of establishing the integrity of her motives in seeking the relocation.

Father's opposition to the relocation is predicated upon several reasons. He believes that he will be unable to preserve his relationships with the children through suitable alternative custody arrangements. He does not believe that the general quality of the children's lives will be enhanced. He does not believe Mother has fully thought through certain practical consequences of the relocation, including the daily transportation issues related to the children's Vermont school attendance. Pursuant to the provisions of Section 5337(i)(2), Father has met his burden of establishing the integrity of his seeking to prevent the relocation.

## (h)(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party:

9

The term "Abuse" as set forth in the "Definitions" section of the Child Custody Act, 23 Pa.C.S. §5321(a), is as follows: "'Abuse.' As defined in section 6102 (relating to definitions)." The cross-reference to Section 6102 is an incorporation of the Protection from Abuse Act's definition of "abuse." None of the testimony presented in this case concerning the conduct of the parties constitutes "abuse" within that definition. Therefore, this factor is inapplicable.

**(h)(10) Any other factor affecting the best interest of the child:**

This factor is not applicable.

Based upon the above analysis, the court concludes that Mother, as the party proposing the relocation, has failed to meet her burden of establishing that the relocation will serve the best interests of the children under the applicable relocation factors, as is required pursuant to Section 5337(i)(1).

Accordingly, the court enters the attached Order.

10

K‌‌‌‌‌ L. W‌‌‌‌,     : IN THE COURT OF COMMON PLEAS
    Plaintiff

         : CHESTER COUNTY, PENNSYLVANIA

   v.       : CIVIL ACTION - LAW

         : IN CUSTODY

C‌‌‌‌ J. W‌‌‌‌,      
    Defendant  : NO. 2015-05718

## MEMORANDUM OPINION

On February 4, 2016, this court issued an Opinion and Order denying Appellant's Petition for Relocation, wherein Appellant ("Mother") sought permission to relocate immediately to West Dover, Vermont with the parties' four children. On February 29, 2016, Appellant filed a Notice of Appeal of that Order to the Superior Court. As a custody matter, the appeal should have been identified by Appellant as a children's fast track appeal pursuant to the provisions of Pa.R.A.P. 1925(a)(2). However, Appellant did not comply with the requirement of Pa.R.A.P. 1925(a)(2)(i) in that the concise statement of errors complained of on appeal was not filed and served with the notice of appeal. Accordingly, on March 1, 2016, the court entered an order for concise statement under Pa.R.A.P. 1925(b). Thereafter, Appellant filed her Concise Statement on March 22, 2016. Ten (10) issues to be raised on appeal have been set forth. This Memorandum Opinion will focus only upon those issues not previously or fully addressed in the court's February 4, 2016 Opinion.

> "2.a. The trial court erred in failing to permit the parties' children to re-testify after a three month break in the testimony over objection of Appellant's counsel."

The court conducted individual in chambers interviews of each of the four W███ children during the afternoon of October 7, 2015. The interviews appear in the record as follows:

T███ W███, age 10        N.T. 10/7/15. pp. 202-222
P██ W███, age 12         N.T. 10/7/15. pp. 222-239
G██ W███, age 15         N.T. 10/7/15, pp. 240-254
C███ W███, age 16        N.T. 10/7/15, pp. 254-272

Counsel were requested to submit to the court proposed questions for the children prior to the interviews. Counsel did submit proposed questions in writing, all of which were reviewed by the court and some of which were utilized by the court. At the conclusion of the court's questioning of each child, counsel were asked whether they had any additional questions to be asked, and one child, Thomas, was brought back into chambers for several more questions. N.T. 10/7/15, pp. 220-222.

It is important in light of this alleged error to know the procedural context preceding the occurrence of these interviews on October 7th. This relocation case was originally allotted two trial days, October 6th and 7th, by the Family Court Administrator. The time allotted was based upon counsel's estimates of the length of presentation. The original intent was for the court, as it almost always does, to conduct the child interviews at the end of the case, after all of the other evidence has been presented. Therefore, prior to commencing trial, it was agreed by counsel and the court that on Wednesday, October 7th, following the afternoon school dismissal, the interviews would occur, presumably taking place as the concluding part of the second and final trial day. By the end of the morning session on October 7th, however, the

2

court observed it was "very clear" that "we're not going to finish this [trial] today." N.T. 10/7/15, p. 140, lines 14-24. Immediately thereafter, Mr. Eells, counsel for Appellant, made a suggestion that "offers of proof" be made "in lieu of calling these [remaining] witnesses... and then, based on that, we can just enter that into the record and move past that so that we can get the children in here at 3:30 and get this thing wrapped up." N.T. 10/7/15, p. 141, lines 3-11. The court then recommended that, over the luncheon recess, "counsel may want to reflect upon" whether to postpone bringing the children in until the trial's rescheduled conclusion, posing the following alternatives: "Is it better to bring them in this afternoon if this case isn't going to be wrapped up for another month and a half, or is it better to defer it until that later time when we will have a quicker resolution [decision] after they have been in here? Why don't you think about that?" N.T. 10/7/15, p. 142, line 19 through p. 143, line 3.

The court next states: "I'm flexible. I understand the pros and cons. Maybe it's best to get them in here and they are done, but then I think it's likely there won't be a resolution of this case for many weeks. So let's come back at 1:40." N.T. 10/7/15, p. 143, lines 4-8. The court also instructed counsel, over the noon break, to go to the Family Court Administrator and obtain additional available trial days. Despite the court's raising the prospect that the interviews might be postponed until the conclusion of the case in January, the attorneys, including Appellant's counsel, nevertheless wished to proceed to bring the children in on October 7th. At no time, however, between October 7, 2015 and January 5, 2016, the day the trial resumed, did counsel

3

for Appellant ever notify the court of a request to bring the children back for a second round of interviews.

Counsel's arguments for and against, and the court's reasons for refusing to permit the Walters children to be re-interviewed, are adequately set forth in detail in the record. See N.T. 1/5/16, pp. 120-136. The Superior Court is respectfully invited to read the back and forth exchange in this portion of the transcript, and, upon doing so, should conclude that the trial court properly exercised it discretion in denying the second interview request.

The trial court is well aware of the importance of having a complete and current record in custody cases, but does not believe that this principle should be extended to require a second round of child interviews in circumstances where: (1) prior to the October interviews, the court suggested that counsel consider postponing the interviews until the rescheduled conclusion date, and counsel for Appellant declined the suggestion; (2) the first round was satisfactorily and fairly conducted; (3) there is no evidence or offer of proof in the record regarding what changes in the children's preferences, if any, may have taken place; (4) there is no realistic opportunity, without further delay, for the party objecting to the re-interviews to explore whether the children may have been somehow influenced in the interim; and (5) the request for second interviews was not made until the very day of the resumed trial, which is to say that a period of three months elapsed with no mention whatsoever of Appellant's desire to bring the children back into court.

4

Finally, while obviously important, the expressed preference of the child is not a singularly determinative relocation factor. The children's preferences, as of their October 7th interviews, are summarized on page 6 of the court's February 4, 2016 Opinion. T▇▇▇ and C▇▇▇ expressed no preference; Paige and Grace both would prefer to relocate to Vermont. Even if, in second interviews, T▇▇▇ and C▇▇▇ had expressed a newly found preference to relocate, it is incorrect to conclude that the court's relocation decision would necessarily have been different.

The following three asserted errors all relate to "educational" issues, and will be addressed together:

> "2.b. The trial court erred in relying on opinion testimony of a lay non-qualified witness as to 'education [sic] development' of the parties' oldest child and its conclusion that 'Mother's proposed relocation is likely to cause a disruptive impact on C▇▇▇'s educational development and a potentially negative impact on his social and emotional development."

> "2.f. The trial court erred in concluding that it would be less disruptive to move the children to a new school district in Pennsylvania than move back to Vermont and into a school district where they have deep roots and previously attended school."

> "2.g. The trial court erred in suggesting that the children move to a new local school district to save private school tuition while opining that it would not be in the oldest son's best interest to leave his current school."

The court focused attention on C▇▇▇ primarily because he is in his junior year in high school. At the time of the court's decision, he was approximately at the mid-point of his junior year, and in his third year at ▇▇▇▇ Academy, a well-regarded college preparatory Catholic school in Claymont, Delaware. C▇▇▇ has an I.E.P. for the special need of an

5

unspecified learning disorder. According to Mother's testimony, C█████ plays varsity lacrosse and varsity soccer, and he enjoys playing those varsity sports.

To a certain extent, the relocation factors require the judge to make predictions of the future. Factor 5337(h)(2) asks that the court consider "...the likely impact the relocation will have on the child's educational... development, taking into consideration any special needs of the child." Factor 5337(h)(7) asks the court to consider "[w]hether the relocation will enhance the general quality of life for the child, including, but not limited to, ... educational opportunity." At its best, a trial court makes well-reasoned and informed determinations concerning these issues, but considerations involving "likely impact" and "whether the relocation will enhance... educational opportunity" remain, in their essence, predictions of unknown future events. A judicial prediction in a custody case necessarily involves an application of common sense. Jurors as fact finders are permitted to rely upon their own common sense in their deliberations, and so, to some degree, must the trial judge as a "fact finder" in analyzing one of the predictive custody factors.

The court stated, at page 4 of its Opinion under factor (h)(2), that "Mother's relocation to Vermont is likely to pose a significant impact for son, C█████ (hereinafter "C█████"), currently in his junior year at █████████ Academy, and in his third year of attending ██████████." In so stating, the court was, in part, applying predictive common sense – the common sense belief being this – that the older the child, and the nearer he is to high school graduation, the more <u>likely</u> it is to be a challenging transition for him to be

6

removed abruptly in mid-year from a familiar school, where he is actively involved and doing well, to a new school, which he has never attended, in another state, and to and from which school he will be doing the daily driving for himself, and his sister, for an hour's trip each way in the morning and afternoon. As the court further stated, at page 5 of its Opinion: "Because G██, P██ and T████ are younger, we conclude the proposed relocation would produce the lower likelihood for an adverse impact upon their physical, educational and emotional development...."

In addition to a permissible and reasonable application of common sense, the court also gave a modest degree of weight to the testimony of Tim Dougherty, an English teacher and the Director of Academics at ████████. Presumably, Mr. Dougherty is the "lay non-qualified witness" referred to in Appellant's issue 2.b. Called by Father as a fact witness, his testimony appears in the October 7, 2015 transcript at pages 60-88. Mr. Dougherty was not called as an expert witness, was not sought to be qualified as an expert witness, and did not offer an "opinion" as an expert witness. The majority of his testimony was directed to C████'s academic career at ████████ including his learning disability testing and accommodation issues. He also testified, based upon his own personal knowledge and experience as the director of academics at a reputable private high school, concerning the potential challenges facing a student who transfers in or out of a school in their later high school years. ████████ has "essentially stopped" permitting transfers at the beginning of a student's senior year. N.T. 10/7/15, p. 72. In terms of his answer that C████'s transferring to an "unfamiliar" or "different"

7

school "would be disruptive," the specific question which produced that answer was not objected to by Appellant. See N.T. 10/7/15, p.76, lines 1-16. Nor was a motion to strike made following the answer. Even had Appellant posed an objection, Dougherty's testimony, to the extent that it was "an opinion," would be permissible under Pennsylvania Rule of Evidence 701, "Opinion Testimony by Lay Witnesses." See Ohlbaum on the Pennsylvania Rules of Evidence §701.08 "Personal Experience as Basis for Opinion." Clearly the director of academics at a college preparatory high school may offer testimony, based upon his personal experience, relative to the academic and social problems experienced by transferring students. This properly admitted testimony corroborated the court's view that C█████'s relocation with Mother to Vermont "is likely to pose a significant impact" for him.

With regard to Appellant's issue 2.f., it is blatantly inaccurate to state that trial court concluded "that it would be less disruptive to move the children to a new school district in Pennsylvania than move back to Vermont and into a school district where they have deep roots and previously attended school." To the contrary, in analyzing Factor (h)(6) at page 7 of its Opinion – specifically, whether the relocation will enhance Mother's general quality of life financially, the court wrote: "Mother's assertion, that if the children attend tuition free schools in Vermont there would be a savings of existing private school tuition payments is unpersuasive, because the children could relocate to a nearby 'better' public school district here in Pennsylvania, such as Unionville-Chadds Ford or Tredyffrin-Easttown, and achieve the same savings." The court was simply commenting on one of Mother's assertions

8

regarding a "financial benefit" of relocation, and absolutely rendered no comparison or conclusion pertaining to a "less disruptive" educational impact upon the children by remaining in Pennsylvania. Additionally, Mother's representation that the children's move back to Vermont would place them "into a school district where they have deep roots and previously attended school" is misleading. The W███████ family lived in West Dover, Vermont for a six month period from February 10, 2012 to August 20, 2012, which likely comprised four months of school attendance. Whether that length of attendance constitutes "deep roots" is questionable. Finally, West Dover, Vermont is a small rural town, with a significant number of vacation homes. Therefore, West Dover has no "school district" of its own, and year-round residents are required to send their children to surrounding schools, such as Brattleboro Area Middle School or Burr and Burton Academy. Finally, none of the W██████ children has "previously attended" Burr and Burton Academy in Manchester, Vermont.

With regard to Appellant's issue 2.g., it is flatly inaccurate to state that the court was "suggesting that the children move to a new local school district to save private school tuition." As mentioned above, the court clearly made no such suggestion.

> "2.c. The trial court erred in its conclusion that 'Father and Mother are equivalent in terms of the "nature," "quality," and "duration" of their relationship with the children.'"

This statement, set forth at page 4 of the court's Opinion under Factor (h)(1), appears following the court's conclusion that, with respect to "extent of involvement," Mother "has been the parent more heavily involved." The terms

9

"nature," "quality," and "duration" of the child's relationship with the parties are not expressly defined in the Custody Act. The parties were still living together in the same residence at the time of trial, never having been separated (except being "legally" separated as the result of Father's divorce complaint filing). The record supports the conclusion that both Mother and Father have always lived under the same roof with their children ("duration"), and have both always been loving, caring and nurturing parents to their children ("nature" and "quality"). The evidence in this record thus supports the conclusion that, although possessing differing parenting skills and styles, the nature, quality and duration of Mother's and Father's relationship with the children are "equivalent."

> "2.d. The trial court erred in its conclusion that Mother has not demonstrated the feasibility of preserving Father's existing relationship with the children through suitable alternative custody arrangements."

See the court's discussion of Factor (h)(3) in its Opinion at page 5.

> "2.e. The trial court erred in concluding that there will be no financial benefit to Mother or the children from the relocation and the Court mischaracterized Mother's testimony regarding her job offer."

The court stated, at page 6 of its Opinion discussing Factor (h)(6): "However, at both the October and January hearing dates, Mother testified that she had potential offers of employment, but not a firm job offer." On October 6th, Mother testified as follows: "Since July, since I filed the relocation petition, I have made extensive efforts to try and find employment in Vermont." N.T. 10/6/15, p. 108, lines 17-19. She then states: "I most recently had an interview for this job on Friday. And it looks like it has a lot

10

of potential. ... And I'm expecting – I'm actually expecting that I'll hear back from them this week with a firm job offer." N.T. 10/6/15, p. 109, lines 1-7. Included in Exhibit M-1, at Tab 8, is a "position description" for this particular job with a "last revised" date of 4/29/2013. Because that date is 2-1/2 years before the date of her testimony, the document clearly cannot constitute any sort of job offer to Mother. Counsel for Mother in a later question refers to "[t]he job that you interviewed for that you thought there was a good possibility in Wilmington [Vermont]." N.T. 10/6/15, p. 120, lines 1-2. During cross examination, Mother was questioned, and provided answers, as follows: "Q And you have not been offered that position, have you? A Well, they're doing background checks and stuff. So I'm hoping I will get a firm job offer this week. Q But as we sit here today, you do not have an offer? A I had more or less a verbal offer, what I would consider a verbal offer. Q You have nothing in writing to indicate the job is yours? A No." Transcript 10/6/15, p. 160, lines 10-21. No written job offer for this employment position was ever made part of the record.

Instead, on January 5, 2016, Mother testified: "I have continued my job search." N.T. 1/5/2016, p. 90, line 2. Although she testified on direct that she had "been offered part-time position in West Dover, Vermont with McCluskey, part time," she immediately qualified her answer by saying "I am still in the process of negotiating everything." N.T. 1/5/2016, p. 90, lines 2-4; lines 7-8. During cross examination, when asked whether she would be paid by the hour, she answered: "That's what I am negotiating right now." N.T. 1/5/2016, p. 112, lines 15-16. When asked how much an hour, her response

11

was "I'm not sure yet. It's about twenty dollars an hour. Q It's about twenty dollars an hour? A Yeah. I am trying to get more. Q Did they communicate this to you in writing? A In email, yes." N.T. 1/5/2016, p. 112, line 21 through p. 113, line 4. The email was not offered as an exhibit.

The court drew the inference, based upon Mother's January testimony that she was "still in the process of negotiating everything," that she still did not have a "firm job offer." If the court was mistaken in that inference, then it would be more accurate to state that Mother had recently received a part-time job offer paying "about twenty dollars an hour," was still in the process of negotiating such a fundamental term of employment as the rate of pay, and did not offer as an exhibit the purported confirming email. Further, there was no additional testimony in January concerning the status the Wilmington, Vermont employment prospect testified to in October. The important point underlying all of this is that Mother first made her decision to relocate to Vermont with the children, and only as an afterthought began to give consideration to whether she could obtain employment. Indeed, her January, 2016 testimony was presented more than six months after she had sent her Notice of Proposed Relocation.

> "2.h. The trial court erred in its finding that the time to travel to Vermont is close to 7 hours and that said travel would prohibit an alternating weekend partial custody schedule upon relocation."

The record supports the court's finding that the driving time from southern Chester County to southern Vermont "with necessary stops... is close to 7 hours." (Emphasis added). Opinion at p. 5, discussing Factor (h)(3). However, even if the one way travel time to Vermont were 5 hours or 6

12

hours, the court's conclusion that "[t]his is not a scenario which will permit an alternating weekend partial custody schedule for Father" would stand.

> "2.i. The trial court erred in its findings that the proposed relocation will reduce, not enhance, the ability of the children to have regular personal contact with their immediate family, and that said contact should have been a factor in the Court's determination."

In addressing Factor (h)(7), whether the relocation will enhance the general quality of life for the children, the court accurately stated that "Mother has no relatives living in Vermont, or the New England area." The court also accurately stated that "Father has many extended family members close by in Pennsylvania, and Mother's mother spends her summers in Ocean City, Maryland." Opinion at p.8. Based upon these facts, the court logically concluded that "the relocation will reduce, not enhance, the ability of the children to have regular contact with their immediate relatives on both sides of the family."

> "2.j. The trial court erred in not considering the totality of the financial benefits of the relocation to Mother by failing to recognize the monetary child/spousal support Mother would be entitled to receive, the flexibility that her work schedule would permit and the minimal housing cost afforded by the relocation."

At the time of trial, Mother was not receiving spousal or child support because Mother, Father and the four children all continued to reside under the same roof at "the farm." At such time as Mother moves elsewhere, she may then begin receiving spousal and child support from Father. However, it will not be her relocation to Vermont which generates this "financial benefit" of spousal and child support; it is her relocation to anywhere from the marital residence which will trigger this "entitlement."

13

With regard to "the minimal housing cost afforded by the relocation," the court did recognize that possibility, placing it in a proper context: "To the extent that the Joans Ridge [Vermont] property is mortgage free, she would experience no monthly housing costs (except utilities and maintenance), but the property is a marital asset, the status of which may be impacted through equitable distribution in the pending divorce." Opinion at p.7, discussing Factor (h)(6).

For all of the above reasons, and for the reasons set forth in the February 4, 2016 Opinion, the court respectfully submits that its conclusion that Mother, as the party proposing relocation, failed to meet her burden of establishing that the relocation will serve the best interests of the children under the applicable relocation factors, should be affirmed.

BY THE COURT:

_April 20, 2016_
Date

_David F. Bortner_            J.

14